FOR PUBLICATION

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS,<br>*Plaintiff-counter-claim-defendant-Appellant,*<br>v.<br>UNITED STATES OF AMERICA,<br>*Defendant-counter-claimant-Appellee.* | FILED<br>JUL 27 2005<br>For The Northern Mariana Islands<br>By No. 03-16556<br>(Deputy Clerk)<br>D.C. No.<br>CV-99-00028-ARM<br>OPINION |

Appeal from the United States District Court
for the District of the Northern Mariana Islands
Alex R. Munson, Chief District Judge, Presiding

Argued and Submitted
November 2, 2004—Honolulu, Hawaii

Filed February 24, 2005

Before: Robert R. Beezer, Susan P. Graber, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Beezer

---

SUMMARY

---

**Government Law/States Rights**

The court of appeals affirmed a judgment of the district court. The court held that the United States acquired paramount interest in the seaward submerged lands found off the

2185

shores of the Commonwealth of the Northern Mariana Islands (CNMI).

Appellant the CNMI filed a quiet title action in district court against appellee the United States, requesting declaratory and injunctive relief to establish the CNMI as the owner of the submerged lands underlying waters adjacent to the Commonwealth. The United States counterclaimed on the title dispute and further sought a judgment decreeing two laws passed by the CNMI legislature to be unenforceable assertions of the Commonwealth's ownership of the submerged lands. Through a Covenant agreement with the United States, the CNMI was under the sovereignty of the United States but retained the right of local self-government. The district court entered summary judgment in favor of the United States.

The CNMI appealed.

[1] The Supreme Court has held that the national government has paramount rights to submerged lands off the shores of states created from former United States territories. [2] The Supreme Court has extended this doctrine to apply, presumably, to all coastal states. [3] The paramountcy doctrine is not limited merely to disputes between the national and state governments. The Ninth Circuit has held that a claim of exclusive aboriginal title to submerged lands was inconsistent with the paramountcy doctrine.

[4] The paramountcy doctrine draws its authority from the inherent obligations placed on the sovereign governing entity to conduct international affairs and control matters of national concern. The Covenant unquestionably placed these powers and obligations in the United States. [5] Because the Covenant places sovereignty and foreign affairs obligations in the United States, the paramountcy doctrine applied.

[6] A strong presumption of national authority over seaward submerged lands runs throughout the paramountcy doc-

trine cases. Absent express indication to the contrary, the ownership of seaward submerged lands accompanies United States sovereignty. The Covenant lacked such an expression. [7] The CNMI could not overcome the paramountcy doctrine because there was no clear intention on the part of the United States to cede its authority off the shores of the Commonwealth that it was obligated to protect. [8] Because the United States had paramount rights to the submerged lands at issue, a declaration of ownership (or sovereignty) over these submerged lands was directly contrary to federal law. The judgment of the district court had to be affirmed.

## COUNSEL

James D. Livingstone, Assistant Attorney General, Saipan, MP, for the plaintiff-counter-claim-defendant/appellant.

David C. Shilton, United States Department of Justice, Washington, D.C., for the defendant-counter-claimant/appellee.

## OPINION

BEEZER, Circuit Judge:

This appeal addresses ownership rights to the submerged lands off the shores of the Commonwealth of the Northern Mariana Islands [hereinafter "CNMI" or "Commonwealth"]. The CNMI filed this quiet title action against the United States, requesting declaratory and injunctive relief to establish the CNMI as the owner of the submerged lands underlying the "internal," "archipelagic," and "territorial" waters adjacent to the Commonwealth. The United States counterclaimed on the title dispute and further sought a judgment decreeing two laws passed by the CNMI legislature to be unenforceable assertions of the Commonwealth's ownership of the submerged lands.

The district court entered summary judgment in favor of the United States. The CNMI now appeals. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

I

The CNMI is a commonwealth government comprised of sixteen islands in the West Pacific.[1] Through a Covenant agreement with the United States, the CNMI is under the sovereignty of the United States but retains the "right of local self-government." Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America §§ 101, 103, Pub. L. No. 94-241, 90 Stat. 263 (1976), *reprinted in* 48 U.S.C. § 1801 note [hereinafter "Covenant"]. As in previous opinions, *see, e.g., United States ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749, 751-52 (9th Cir. 1993), we briefly summarize below the history of the relationship between the United States and the people of the islands included in the Commonwealth in order to provide the legal background for this lawsuit.

A

Following World War II, the United Nations established the "Trust Territory of the Pacific Islands" [hereinafter "TTPI"] over Micronesian islands in the Pacific. The United States "was not a sovereign over, but a trustee for the [TTPI]." *Wabol v. Villacrusis*, 958 F.2d 1450, 1458 (9th Cir. 1992). The "paramount duty of the United States was to steward Micronesia to self government." *Temengil v. Trust Territory of the Pacific Islands*, 881 F.2d 647, 649 (9th Cir. 1989) (discussing Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, United States-United

---

[1] The Northern Marianas are in the same geographic chain of islands as Guam (which is the "Southern" Mariana). Stanley K. Laughlin, Jr., *The Law of United States Territories and Affiliated Jurisdictions* § 21.1 (1995).

Nations, art. 6, 61 Stat. 3301, T.I.A.S. No. 1665). Inhabitants of the TTPI formed a Congress in 1965 to discuss the future political alignment of the islands. *See* Stanley K. Laughlin, Jr., *The Law of United States Territories and Affiliated Jurisdictions* § 22.3 (1995). Representatives from one sub-group of islands, the Northern Marianas, favored establishing closer ties with the United States than representatives from the other islands. Ultimately, a delegation from the Northern Marianas entered into independent negotiations with the United States. The Covenant formed out of those talks. In 1975, the Northern Mariana Islands legislature unanimously approved the Covenant and 78.8% of voters in the Northern Marianas ratified the agreement in a plebiscite vote. *See De Leon Guerrero*, 4 F.3d at 751. Congress enacted the Covenant into law in 1976. Pub. L. No. 94-241, 90 Stat. 263 (1976).

The Covenant's ten articles detail the political relationship between the United States and the CNMI. Of particular relevance here is Article I. In addition to guaranteeing the Commonwealth the right of local self-government under the sovereignty of the United States, *see* Covenant §§ 101, 103, Article I provides that the Covenant, "together with those provisions of the Constitution, treaties, and laws of the United States applicable to the Northern Mariana Islands, will be the supreme law of the Northern Mariana Islands." *Id.* § 102. Article I also establishes that the United States has "complete responsibility for and authority with respect to matters relating to foreign affairs and defense." *Id.* § 104.

Articles V, VIII and X of the Covenant also play central roles in this dispute. Pursuant to Article V, only certain provisions within the United States Constitution and other federal laws are applicable to the Commonwealth. *See id.* §§ 501, 502. Article VIII addresses distribution of "Property" within the Northern Marianas. In relevant part, Section 801 specifies that:

> All right, title, and interest of the Government of the Trust Territory of the Pacific Islands in and to real

property in the Northern Mariana Islands on the date of the signing of this Covenant or thereafter acquired in any manner whatsoever will, no later than upon the termination of the Trusteeship Agreement, be transferred to the Government of the Northern Mariana Islands.

Finally, Article X controls how and when the provisions of the Covenant come into force. *Id.* § 1003. Some provisions, including Section 801's transfer of property, became effective immediately upon the Covenant's approval. *See id.* § 1003(a). Others, such as the right to local self-government, *id.* § 103, required the additional approval of the Covenant's Constitution, which occurred in 1978. *See id.* § 1003(b); *Temengil,* 881 F.2d at 650. The remainder became effective after the official termination of the trusteeship in 1986. *See Sagana v. Tenorio,* 384 F.3d 731, 733-34 (9th Cir. 2004), *petition for cert. filed,* 73 U.S.L.W. 3355 (U.S. Dec. 6, 2004) (No. 04-774). Included in this last category are the provisions establishing United States sovereignty and authority over foreign affairs and defense of the Commonwealth. Covenant §§ 101, 104.

## B

The CNMI brought this action under the Quiet Title Act, 28 U.S.C. § 2409a, requesting a declaration that the Commonwealth holds title to, or for an order mandating that the United States quitclaim any interests in, the submerged lands "underlying the internal waters, archipelagic waters, and territorial waters adjacent to the Northern Mariana Islands." The CNMI further requested the court to enjoin the United States from claiming ownership of the submerged lands. The United States counterclaimed. After resolution of some procedural hurdles,[2] both parties filed for summary judgment. The district

---

[2]The CNMI filed two "largely identical" actions, one in 1997 and the present suit in 1999. The 1997 action did not comply with provisions of

CNMI v. UNITED STATES 2191

court granted the United States' motion, declaring that the "United States possesses paramount rights in and powers over the waters extending seaward of the ordinary low water mark of the Commonwealth Coast and the lands, minerals, and other things of value underlying such waters."[3] The court also declared that the CNMI's Marine Sovereignty Act of 1980, 2 N. Mar. I. Code §§ 1101 - 1143 (1999), and Submerged Lands Act, 2 N. Mar. I. Code §§ 1201 - 1231 (1999), were preempted by federal law. This appeal followed.

## II

We review de novo the district court's decision to grant or deny summary judgment. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004) (reviewing grant of summary judgment); *Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004) (reviewing an appealable denial of summary judgment). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the court determines that the district court correctly applied the substantive law. *Olsen*, 363 F.3d at 922. We may affirm on any ground supported by the record. *Id.*

The district court properly granted summary judgment to the United States on the basis of the federal paramountcy doc-

---

the Quiet Title Act applicable only to states; the present 1999 action did. In *Northern Mariana Islands v. United States*, 279 F.3d 1070, 1071 (9th Cir. 2002), we held that because the CNMI must be treated as if it were a state for purposes of the Quiet Title Act, the CNMI qualified for the state exemption to the Act's time-bar provision.

[3]The district court did "not address [the] aspect of the Commonwealth's complaint" involving submerged lands under "internal" waters because the United States did not contest ownership of these submerged lands. *Northern Mariana Islands v. United States*, No. 99-0028, 2003 WL 22997235, at *15 n.16 (D. N. Mar. I. Aug. 7, 2003) (order granting United States' motion for summary judgment). We likewise limit our analysis to the submerged lands addressed by the district court's summary judgment.

trine. This doctrine instructs that the United States, as a "function of national external sovereignty," acquires "paramount rights" over seaward submerged lands. *United States v. California*, 332 U.S. 19, 34 (1947). Because the United States did not expressly cede its paramount rights to the submerged lands at issue here, summary judgment in favor of the United States was proper.

### A

[1] We discussed the origins of the paramountcy doctrine in *Native Village of Eyak v. Trawler Diane Marie, Inc.*, 154 F.3d 1090, 1092-95 (9th Cir. 1998) (*Eyak I*). We briefly review that history here. The Supreme Court established the paramountcy doctrine through a series of cases between the federal government and shoreline states. In *California*, the Court held that the national government had paramount rights to submerged lands off the shores of states created from former United States territories. 332 U.S. at 38. The Court based its decision on theories of national interest and defense, concluding that because the sea had customarily been within the realm of international law, the federal government had an overriding interest in maintaining authority over these areas that were subject to international dispute and settlement. *Id.* at 34-36. As the Court explained a few years later in *United States v. Louisiana*, 339 U.S. 699, 704 (1950):

> The marginal sea is a national, not a state concern. National interests, national responsibilities, national concerns are involved. The problems of commerce, national defense, relations with other powers, war and peace focus there. National rights must therefore be paramount in that area.

[2] The Supreme Court has extended this doctrine to apply, presumably, to all coastal states. In *United States v. Texas*, 339 U.S. 707, 717-19 (1950), the Court held on the basis of "equal footing" and national interest principles that even a

CNMI v. UNITED STATES 2193

state previously possessing both "*dominium*" (ownership) and "*imperium*" (governmental powers and sovereignty) over its marginal sea as an independent sovereign lost that authority upon entry into the Union. *See id.* at 719 ("[A]lthough *dominium* and *imperium* are normally separable and separate, this is an instance where property interests are so subordinated to the rights of sovereignty as to follow sovereignty.") (footnote omitted). A quarter-century later, the Court again invoked national interest principles to establish in *United States v. Maine*, 420 U.S. 515, 519 (1975), that the federal government had paramount rights to submerged lands off the coasts of even Atlantic states that claimed to be successors in title to the original colonies.[4]

[3] Although the Supreme Court's paramountcy decisions all involved states as parties, "the paramountcy doctrine is *not* limited merely to disputes between the national and state governments." *Eyak I*, 154 F.3d at 1095. We held in *Eyak I* that a claim of exclusive aboriginal title to submerged lands was inconsistent with the paramountcy doctrine.[5] We reasoned that "[a]ny claim of sovereign right or title over the ocean by any party other than the United States, including Indian tribes, is equally repugnant to the principles established in the paramountcy cases." *Id.*

The national interest principles that support the paramountcy doctrine do provide some limitation on its scope. The doctrine does not apply to land under "inland navigable

---

[4]Connecticut was not a defendant in *Maine*, "apparently because that State borders on Long Island Sound, which is considered inland water rather than open sea." *Maine*, 420 U.S. at 517 n.1.

[5]We granted initial en banc hearing of the appeal in the subsequent litigation in *Eyak Native Village*. *Eyak Native Vill. v. Daley*, 364 F.3d 1057 (9th Cir. 2004). The en banc panel vacated the district court's grant of summary judgment and remanded with instructions, while retaining jurisdiction over all future proceedings related to that litigation. *Eyak Native Vill. v. Daley*, 375 F.3d 1218 (9th Cir. 2004) (en banc) (*Eyak II*). The en banc proceedings left undisturbed this court's decision in *Eyak I*.

waters such as rivers, harbors, and even tidelands down to the low water mark." *California*, 332 U.S. at 30 (discussing *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212 (1845)). This limitation reflects the different concerns present with "internal" and "external" submerged lands: the state interest diminishes, and the national interests increases, as the land in question moves further into the open sea. *See id.* at 29-35.

### B

Allegiance to the paramountcy doctrine compels us to begin with the presumption that the United States acquired paramount rights to the disputed submerged lands off the CNMI's shores as a function of sovereignty. As we have held in *Eyak I*, the underlying principles of this doctrine apply "with equal force" to relationships other than that between states and the federal government. 154 F.3d at 1096. Through the Covenant, the Commonwealth agreed to United States sovereignty and received (among other benefits) protection and security in return. As the Court recognized in *California*, the United States' foreign affairs obligations demand that the national government have authority to control areas of national concern. *See* 332 U.S. at 35-36. Absent an express indication to the contrary, we will not presume the parties intended a different arrangement here.

The CNMI principally challenges the reliance on the paramountcy cases for two reasons.[6] First, the Commonwealth contends that the paramountcy doctrine is inconsistent with the Covenant's limitations on the application of federal law to

---

[6] We are unpersuaded by the Commonwealth's other arguments as well. We do not reach whether the CNMI government may properly raise an aboriginal title claim on behalf of its native inhabitants because our decision in *Eyak I* forecloses an aboriginal title challenge to our paramountcy holding. *See* 154 F.3d at 1095-97. We also refuse to extend common law trust principles to an international agreement that constituted, on the part of the people of the Northern Mariana Islands, "a sovereign act of self-determination." *See* Covenant pmbl.

the CNMI. Second, the CNMI argues alternatively that the Covenant's transfer of real property creates a "recognized exception" to the paramountcy doctrine. We disagree on both counts.

1

The CNMI first asserts that the unique relationship between the United States and the CNMI makes the paramountcy doctrine inapplicable. According to the CNMI, federal law applies to the Commonwealth only to the extent that it is consistent with the Covenant. The CNMI argues that because the rationale for the paramountcy doctrine is based on foreign commerce, foreign affairs, and national defense powers found within the United States Constitution, the doctrine cannot apply to the CNMI because the Covenant does not expressly provide the United States with this same constitutional authority over the Commonwealth.

[4] We do not dispute that " 'the authority of the United States towards the CNMI arises solely under the Covenant.' " *Sagana*, 384 F.3d at 734 (quoting *Hillbloom v. United States*, 896 F.2d 426, 429 (9th Cir. 1990)). But the CNMI's argument wrongly assumes that the paramountcy doctrine and the Covenant are inconsistent. The paramountcy doctrine draws its authority from the inherent obligations placed on the sovereign governing entity to conduct international affairs and control matters of national concern. *See California*, 332 U.S. at 35-36; *see also Eyak I*, 154 F.3d at 1096 ("This principle applies with equal force to *all* entities claiming rights to the ocean[.]"). The Covenant unquestionably places these powers and obligations in the United States. *See* Covenant § 101 (establishing a Commonwealth "in political union with and under the sovereignty of the United States of America"); *id.* § 104 (providing the United States with "complete responsibility for and authority with respect to matters relating to foreign affairs and defense"). The CNMI's attempt to differentiate between a paramountcy doctrine based on pow-

ers found solely in the United States Constitution and one that is incorporated through the Covenant separates the doctrine from its rationale.

[5] " '[O]nce low-water mark is passed the international domain is reached.' " *Eyak I*, 154 F.3d at 1094 (quoting *Texas*, 339 U.S. at 719). The submerged lands addressed by the district court's summary judgment fit this description. Because the Covenant places sovereignty and foreign affairs obligations in the United States, the paramountcy doctrine applies.

2

The CNMI next argues in the alternative that the Covenant transferred the submerged lands to the Northern Mariana Islands, thereby meeting a recognized exception to the paramountcy doctrine that allows Congress to cede its paramount authority over seaward submerged lands. The fact that the United States *may* provide the submerged lands to the CNMI does not mean it has done so here. Neither the text of the Covenant nor the actions taken by the parties during and after the negotiations lead to a conclusion that such a transaction took place.

The CNMI correctly asserts that, despite the national concerns underlying the paramountcy doctrine, Congress can transfer ownership of submerged lands to the states or other entities. Congress has done so in the past. *See, e.g.*, Submerged Lands Act of 1953, 43 U.S.C. §§ 1301, 1311 (transferring submerged lands up to three miles from shore back to the states); *see also Maine*, 420 U.S. at 525-27 (observing that the Court held the Submerged Lands Act constitutional in *Alabama v. Texas*, 347 U.S. 272 (1954)).

The CNMI argues that the Covenant effected a similar transfer. The core of the CNMI's argument is that the transfer of "real property" in Section 801 of the Covenant includes

seaward submerged lands. As noted above, Section 801 provides that "[a]ll right, title and interest of the Government of the [TTPI] in and to real property in the Northern Mariana Islands . . . will, no later than upon the termination of the Trusteeship Agreement, be transferred to the Government of the Northern Mariana Islands." Although the Covenant does not define real property, the Commonwealth notes that the Quiet Title Act itself specifically includes disputes over "tide and submerged lands." 28 U.S.C. §§ 2409a(i) - (l). If such lands were not "real property," the Commonwealth argues, such suits could not be brought under the Quiet Title Act.

We are hesitant to ascribe an implicit intent to cede paramount rights over seaward submerged lands on this basis. There is a significant distinction between the statutory transfers relied on by the CNMI and the alleged transfer in the Covenant: the statutes cited by the Commonwealth explicitly apply to submerged lands. *See* 43 U.S.C. § 1301 (defining submerged lands); 48 U.S.C. § 749 (defining and conveying submerged lands to Puerto Rico); 48 U.S.C. § 1705 (describing and conveying submerged lands to Guam, the Virgin Islands and American Samoa). The transfer found in Hawaii's Statehood Act is also informative. In addition to transferring to the new state all lands formerly held by the Territory as well as title to certain public lands held by the United States, this act also expressly made the Submerged Lands Act applicable to the new state. *See* Pub. L. No. 86-3, 73 Stat. 4 (1959). What these statutes demonstrate is that Congress knew how to grant submerged lands when it so desired. The fact no reference to submerged lands appears in the Covenant counsels against implying such a meaning here.

Ambiguity in drafting is far from novel, even within the limited universe of paramountcy cases. California raised an argument similar to the one the CNMI makes here, arguing that the state's Enabling Act ratified a territorial boundary that included a three-mile marginal sea. *California*, 332 U.S. at 29-30. Although the Court's opinion did not focus on this

2198        CNMI v. UNITED STATES

assertion, judging from the Court's favorable decision for the United States, this argument apparently carried little weight.[7]

[6] A strong presumption of national authority over seaward submerged lands runs throughout the paramountcy doctrine cases, and we extend that same presumption to the case at hand.[8] Absent express indication to the contrary, the ownership of seaward submerged lands accompanies United States sovereignty. The Covenant lacks such an expression.

[7] The CNMI can point to no language in the Covenant that expressly addresses submerged lands. Instead, the Commonwealth urges us to consider the expansive records of the Covenant's negotiations and history to extract the agreement's meaning. The district court's analysis of the extrinsic evidence relied on by the Commonwealth is persuasive. We conclude that there exists no genuine issue of material fact because the evidence is not "such that a reasonable jury could return a verdict for the nonmoving party." *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003) (internal quotation marks omitted). The CNMI cannot overcome the paramountcy doctrine because there is

---

[7]In *Texas*, the Court avoided a similar issue by relying on an "equal footing" clause rationale not available here. *See* 339 U.S. at 714.

[8]We also note, but do not rely on, the general presumption inherent in public land cases that transfer of title from the federal government is not lightly inferred. *See Guam ex rel. Guam Econ. Dev. Auth. v. United States*, 179 F.3d 630, 638 (9th Cir. 1999) (citing *United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 116 (1957)). Such a presumption does not apply with respect to grants to Native Americans. *See id.* (citing *County of Yakima v. Confed. Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992)); *but cf. United States v. Washington*, 157 F.3d 630, 645-46 (9th Cir. 1998) (discussing circumstances in which the equal footing doctrine limits the implied transfer of non-oceanic submerged lands to Indian tribes). Because our decision does not rely on this general presumption, we do not find it necessary to decide whether the canons of construction applicable to Indian treaties should also apply to inhabitants of the CNMI. *Cf. Guam*, 179 F.3d at 638 (declining to decide the issue with respect to natives of Guam).

| CNMI v. UNITED STATES | 2199 |
|---|---|

no clear intention on the part of the United States to cede its authority off the shores of the Commonwealth that it is obligated to protect.

The CNMI places substantial emphasis on two orders by the Secretary of Interior to support its position. The purpose of Secretarial Order No. 2969, 40 Fed. Reg. 811 (1974), was to implement a 1973 policy statement by the United States. *Id.* at 812. The order empowered local district legislatures within the TTPI to create legal entities "to hold title to public lands within the district." *Id.* at 812. This order expressed "[l]imitations" on the transfer of, *inter alia*, "submerged lands." *Id.* It required the local legislatures to reserve "the right of the central government of the [TTPI] to regulate all activities affecting conservation, navigation, or commerce in and to the navigable waters and tidelands, filled lands, submerged lands and lagoons." *Id.* at 812. As the district court found, this order was not even implemented in the Northern Mariana Islands.

Secretarial Order No. 2989, 41 Fed. Reg. 15,892 (1976), applied solely to the Northern Marianas and became effective shortly after the Covenant's approval. The order addressed the interim governing trust administration of the Northern Marianas. One of its provisions transferred title to "public lands" from the TTPI to another administrator, the United States "Resident Commissioner." *Id.* at 15896. There is no indication in this order that the United States contemplated a permanent divestment of the paramount rights that the United States would obtain upon assuming sovereignty. Under the terms of the Covenant, the United States did not obtain that sovereignty until after the termination of the trust relationship. *See* Covenant § 1003. Read in context of the Covenant, Order 2989 demonstrates at most the recognition by the United States that the paramountcy doctrine could not apply until the United States acquired that sovereignty.

Other extrinsic evidence further erodes the CNMI's claim. Position papers by the Commonwealth have, on prior occa-

2200   CNMI v. UNITED STATES

sions, described the Covenant's lack of discussion about submerged lands as a "curious blind spot" within the agreement. We have relied in previous opinions on the Marianas Political Status Commission's "authoritative" "Section-by-Section Analysis of the Covenant" to assist us in discerning the meaning of the Covenant. *See Fleming v. Dep't. of Pub. Safety*, 837 F.2d 401, 408 (9th Cir. 1988), *overruled on other grounds*, *DeNieva v. Reyes*, 966 F.2d 480, 483 (9th Cir. 1992); *see also Sagana*, 384 F.3d at 734 (referencing the Analysis). Like the Covenant itself, this Analysis does not address submerged lands, shedding no light on this issue.

The official[9] analysis to the CNMI Constitution does not help the Commonwealth's position, either. This document acknowledges that the United States "has a claim to the submerged lands off the coast of the Commonwealth" based on the paramountcy doctrine. It explains that the CNMI's Constitution "recognizes this claim and also recognizes that the Commonwealth is entitled to the same interest in the submerged lands off its coasts as the United States grants to the states." Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands 144 (Dec. 6, 1976). We agree. Absent express language to the contrary, the CNMI is entitled to the same interest in the seaward submerged lands as that of the states when they submitted to the sovereignty of the United States. As the paramountcy cases established, that state interest is inferior to the federal rights. Although states have acquired greater control over submerged lands through congressional action, no similar legislation has provided analogous rights to the CNMI.

---

[9]We have previously noted that the Northern Mariana Islands' Constitutional Convention officially adopted this analysis. *See Sablan v. Santos*, 634 F.2d 1153, 1154 (9th Cir. 1980), *superseded by statute on other grounds as recognized by Gioda v. Saipan Stevedoring Co.*, 855 F.2d 625, 628-29 (9th Cir. 1988).

3

As the CNMI acknowledges, when the people of the Northern Mariana Islands and the United States entered into the Covenant agreement in 1975, "both parties had reason to seek a union." Both parties received benefits from this agreement. That the newly formed Commonwealth subsequently objected to the loss of title to submerged lands as result of agreeing to United States sovereignty is as unavailing to the CNMI as that same argument was to states in *California, Texas, Louisiana* and *Maine*. The CNMI's position is even less persuasive given that the Covenant was negotiated after the paramountcy doctrine had become well-settled law.

We recognize the importance of the submerged lands surrounding the CNMI to the culture, history and future of the Northern Mariana Islands. We also trust that the Supreme Court was cognizant of the similar importance of submerged lands to coastal states. *See, e.g., California*, 332 U.S. at 40. The Supreme Court established the paramountcy doctrine in spite of these circumstances, leaving it to Congress to provide remedies for the states if it so chose. That same avenue is available here.

III

[8] The Commonwealth admits that its Submerged Lands Act, 2 N. Mar. I. Code §§1201 - 1231,[10] and Marine Sovereignty Act of 1980, 2 N. Mar. I. Code §§ 1101 - 1143,[11] "com-

---

[10] The Commonwealth's Submerged Lands Act controls the management of submerged lands owned by the CNMI. The CNMI legislature declared through this act, as amended, that the CNMI government has authority over "all submerged lands in the Northern Mariana Islands." *See* PL 6-13 § 1 (1988) (codified as amended 2 N. Mar. I. Code § 1201 note).

[11] The Marine Sovereignty Act of 1980 declares "that the sovereignty of the Commonwealth extends beyond its land area to its internal waters, archipelagic waters, and territorial sea." 2 N. Mar. I. Code § 1114 (a). The

2202    CNMI v. United States

bine to assert the Commonwealth's ownership of the submerged lands" in dispute. Because we hold that the United States has paramount rights to the submerged lands at issue here, *see supra*, a declaration of ownership (or sovereignty) over these submerged lands is directly contrary to federal law. *See Texas*, 339 U.S. at 719 ("[T]his is an instance where property interests are so subordinated to the rights of sovereignty as to follow sovereignty."). The district court properly held that the Commonwealth's Submerged Lands Act and Marine Sovereignty Act of 1980 are preempted by federal law. *Cf. Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) ("Our primary function is to determine whether . . . [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

## IV

We hold that the United States acquired paramount interest in the seaward submerged lands, as defined by the Supreme Court in *California*, found off the shores of the Commonwealth of the Northern Mariana Islands.[12] Laws passed by the CNMI legislature to the contrary are inconsistent with the par-

---

territorial sea has an outer limit of 12 miles from the "baseline" (the line segment designating the border of the archipelagic waters). *Id.* § 1123. This Act also declares that the CNMI has "sovereign rights" in an "exclusive economic zone," which is the area of sea immediately beyond the territorial sea, generally to a distance of 200 miles from the baseline. *Id.* §§ 1114(b), 1124. The Act also provides that it does not "impose any impediment to any lawful action taken by the government of the United States for the defense and security of the Commonwealth or of the United States." *Id.* § 1136.

[12]We express no opinion as to the specific contours of the boundaries of these waters and we do not read the district court's summary judgment as doing so, either. *Cf. California*, 332 U.S. at 26 ("[T]here is no reason why, after determining in general who owns the three-mile belt here involved, the Court might not later, if necessary, have more detailed hearings in order to determine with greater definiteness particular segments of the boundary.").

amountcy doctrine and are preempted by federal law. The district court's grant of summary judgment for the United States is AFFIRMED.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2005 Thomson/West.